```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT COURT OF KANSAS
 2
    UNITED STATES OF AMERICA,      )
 3  ex rel. THOMAS SCHROEDER,      )
                                   )
 4                  Plaintiff,     )
                                   ) No. 2:17-02060-DCC-KGG
 5          vs.                    )
                                   )
 6  MEDTRONIC, INC., and           )
    HUTCHINSON REGIONAL            )
 7  MEDICAL CENTER,                )
                                   )
 8                  Defendants.    )

 9

10          The deposition of RICK AMENT, called by the

11  Plaintiff for examination taken pursuant to the

12  Federal Rules of Civil Procedure of the United

13  States District Courts pertaining to the taking of

14  depositions, taken before Valerie Calabria, CSR,

15  RPR, taken at 111 South Wacker Drive, Chicago,

16  Illinois, on December 13, 2022, at 10:01 a.m.

17

18

19

20

21

22

23

24
```

Page 14

needed to have a master's degree.

So the Air Force made me a federal agent, and I spent four years as a federal agent while I achieved my master's degree. Upon receiving my master's degree, I spent two years as a hospital administrator in the Air Force. Left the military and became a hospital executive in the private sector.

And the rest is just various hospitals and/or executive roles as either a regional administrator running multiple hospitals or in numerous turnaround roles where I would go to a hospital, either as a CEO or as a consultant, and initiate a turnaround.

Q. So of that experience, when you're managing hospitals, how many -- how much of that was a private hospital versus a federally owned hospital?

A. The VA is my first federally owned experience. All of my experience prior to the VA was in the private sector.

Q. Okay. And when did you start with the VA?

A. I think it was December 12th, 2016.

Page 15

Basically -- no, 2017 is when I started, but I think I had one pay cycle in 2016.

Q. And where did you start physically?

A. Wichita. Robert J. Dole.

Q. In Wichita?

A. Yes.

Q. And so in approximately January of 2017 is when you started at Dole VA. What was your title?

A. Medical center director.

Q. And did that involve, like, a move for you to Wichita, or were you already in the Wichita area?

A. No, it was a move to Wichita.

Q. And where were you moving from?

A. Indianapolis, Indiana.

Q. And you were at a private hospital there?

A. Correct.

Q. Which hospital?

A. I was with the Select Medical Corporation.

Q. And what was your position there?

A. CEO.

Page 16

Q. And how many hospitals were in the Select Medical Corporation group?

A. This is going to be an approximation. 115 to 125.

Q. And that's great. Please tell me if you're approximating a number. That's really helpful.

So when you are the medical center director over at the Dole VA, is the Dole VA the only hospital within your management purview?

A. The Dole hospital is the only hospital within my purview, yes.

Q. Was there anything else under your guidance?

A. Yes. We had six community-based outpatient centers throughout the state of Kansas.

Q. And where was your office located while you were the director?

A. In the hospital proper.

Q. Did you ever have any occasion to go into or be around the cath lab at the Dole VA?

A. Not in a clinical, professional capacity. But in my role as executive, you know, I rounded, I met with staff.

Page 17

Q. How often?

A. I rounded every day. I was probably in the cath lab, to be fair, no more than once a month.

Q. And at some point you left the Dole VA, correct?

A. Mm-hmm.

Q. Okay. Do you recall approximately when you left?

A. I do. March 31st, 2020.

Q. Okay. And where did you leave to go to?

A. I came here to Chicago to be the medical center director for Jesse Brown VA.

Q. Are your duties similar that you're doing for the Jesse Brown VA as they were to the Dole VA?

A. The role is similar, yes.

Q. Okay. Is the Jesse Brown VA a larger VA system?

A. Larger and more complex, yes.

Q. So this would have been a promotion?

A. Financially, no. In terms of level within the VA, yes. Yeah.

Q. Okay. So you were at the Dole VA as

Page 26

BY MS. BROUS:
Q. And you said the VISN, V-I-S-N?
A. Correct.
Q. I've seen that. Okay. What hospitals were in the Dole VA VISN?
A. It would have been the Kansas City VISN, and the Dole VA was a part of that VISN. It would have included a facility at -- in Fort Leavenworth. It would have included the Kansas City facility; the St. Louis facility; the Poplar Bluff facility; the Marion, Ohio, facility. I'm sorry. That's Marion, Illinois. And then I'm trying to think -- oh, Columbia, Missouri. That should be eight.
Q. I think I have seven, if you count Dole VA. Was there one in Nebraska?
A. No. I'm probably missing one.
Q. Okay. And Poplar Bluff, Missouri, correct?
A. Correct.
Q. Okay.
A. Mm-hmm.
Q. And then did you look outside of your VISN at other comparable-sized VAs?
A. We did because, within our VISN, we

Page 27

weren't probably as comparable as I would have liked to have been. Because with only eight facilities, you know, there's quite a bit of variance there. So we looked across the nation in the VA, and not just at comparable facilities to us, but comparable facilities that were even more complex, just to get kind of perspective.
Q. Okay. Do you recall some of the names of those facilities or places?
A. Absolutely. Denver, Colorado, was a big one because they were somewhat regional to us, much higher acuity, much more complexity. Facilities like Atlanta, facilities like, you know, some of the larger East Coast facilities. Indianapolis would have been on that list. Larger, higher-acuity facilities, just for us to get some perspective.
Q. And how did Dole VA stack up when you looked at the bigger facilities like Denver, Atlanta, and Indianapolis?
A. So this is a recollection.
Q. Sure.
A. But it's very strong in my memory bank. I want to say our costs were approximate -- at

Page 28

least two times higher than the next closest facility, which would have been Denver at the time, and at the time Denver did open hearts.
Q. Were you just looking at cardiac costs, or were you looking at all procedures?
A. Initially, it was -- let me clarify.
Q. Sure.
A. The strategic initiative was to look at all costs and classify, kind of, in buckets of opportunity. As we drilled down initially, this was -- the initial focus was on cardiac procedures.
As we got further into the analysis, we realized that at the Dole VA they didn't segregate the costs from interventional radiology and cardiology, which we should have done. Once we segregated those costs out, we realized we were not the most expensive cardiac program in the country.
Q. That's helpful. So when you were saying you were looking at cardiac costs and relative to these other Dole VAs, that cardiac costs included at the time both interventional radiology and cardiology procedures, correct?
A. That is correct.
Q. Okay. And then what did you find once

Page 29

you segregated those two?
A. Once we segregated them, it became apparent that it was not our cardiac costs that was the outlier; it was the interventional radiology costs that were the outlier.
Q. And what do you recall about how big of an outlier the interventional radiology costs were?
A. You know, I don't have that at my fingertips or even my exact recollection. It was substantial. It was substantial enough to make our cardiology program look more expensive, by two, than the next most acute cardiac program in the country. So it was substantial.
Q. And I think you said earlier you have a strong memory of this. Why is that?
A. It jumped out. Because of my background, certain things just jumped out as outliers, and this was an outlier. We were doing something different than other people.
Q. Is it fair to say it raised a red flag in your mind?
MS. HUYSER: Objection to form.
THE WITNESS: It alerted me. It alerted me.

Page 30

BY MS. BROUS:
Q. Once you were alerted, then what did you do?
A. From a sequencing perspective -- I'm sure my sequencing won't be exactly correct, but this was in the context of the cost-reduction initiative. And we did a number of things, but my standard approach is to sit down, pull together a small group to focus more closely, and to put together what I call an accountability matrix or a plan. And then we would start methodically addressing the data to conclusion.
Q. So do you recall what members you assigned to this small group?
A. I remember two specifically because they were more analytical in nature. I know there were others, but the two that come to mind were our materials or logistics manager, Ryan Kittrell, and my -- I'll call it analytic system analyst, Susan Hastings.
Q. And I missed, what's Ms. Hastings' title, to the best of your memory?
A. I believe she may have had two titles. One is she was our chief of performance improvement

Page 31

or systems redesign. She was also our chief analyst for, I'll say, business analytics.
Q. Okay. Great. Do you know if Mr. Kittrell or Ms. Hastings -- to your knowledge, are they still with the Dole VA, or do you have any knowledge of that?
A. I don't know. My understanding is that Ms. Hastings has taken a role somewhere else, but I don't know that to be true.
Q. Okay. And what about Mr. Kittrell; do you know anything about his whereabouts?
A. I don't.
Q. Do you still talk to or correspond with anyone at Dole VA currently?
A. I do not.
Q. Okay. So you get together this small group, and then, kind of, what happens?
A. So we kind of mapped out an approach. What are the true implications here? And it was, you know -- when we do this, we sit down with kind of a blank sheet of paper, and we get some subject matter experts in the room, which would often include some clinical folks, as well.
And we would say, okay, what are the

Page 32

kinds of things we're trying to address here; everything from contractual issues to cost-per-unit issues to internal procedural issues to clinical outcomes. And we wanted to look at all of that because I didn't know -- none of us really knew what we were dealing with. It wasn't a small variance from the norm. It was so significant, we needed to get to the bottom of it.
Q. So I wrote down that you were looking at contractual issues, cost-per-unit issues, and clinical outcomes. Did I miss anything?
A. Yes. And this won't be comprehensive because --
Q. Sure.
A. -- I would have to look at our map to see what we mapped out.
Q. Yep.
A. But it would also look at procedural issues in terms of the mechanisms and the methods that the inventory would come into the facility.
Q. Okay.
A. Yeah.
Q. Okay. So let's just kind of take these issues one by one and see if you have any memory

Page 33

currently of what you found.
So starting with the contractual issues, do you recall any analysis or findings or recommendations?
A. So I'm going to be very vague only because this was not complete when I left.
Q. Okay.
A. And some of these answers will talk to what our intent was, but how far we had gotten down that path, I don't recall.
So from a contractual perspective, the questions were what latitude or what leverage do we have with the contracts that are in place. In other words, are we bound to both the product as well as the providers contractually. Not that we would or wouldn't do anything with that information, but, to me, I needed to have a good handle on what all of the issues were. It was a data point that we needed to understand.
Q. Do you recall understanding anything else about that issue?
A. My understanding was that we did nothing contractually, but we did assess what our ability was contractually.

Page 38

 1    A.   None.
 2    Q.   Okay.  Do you know -- did you hand that
 3 project off to someone, or do you know who might
 4 know?
 5    A.   I left very quickly because, the way the
 6 VA works, we're not allowed to talk about our new
 7 assignment until it's public.  And in my case I had
 8 a three-day window.  I knew for months, but the
 9 world didn't know.  So the transition was very
10 rapid, and my replacement wasn't even at the
11 facility at that point.
12         So my understanding is it would have
13 been the associate director who was also involved
14 with this process.
15    Q.   And who was that at the time?
16    A.   Dana Foley.
17    Q.   D-a-n-a?
18    A.   Yes.
19    Q.   Woman?
20    A.   Correct.
21    Q.   Okay.  F-o-l-e-y?
22    A.   I believe so.
23    Q.   Okay.  So she was involved and still
24 there when you left and knew what was going on with

Page 39

 1 this small group, correct?
 2    A.   She knew as much or perhaps more than I
 3 did.
 4    Q.   Okay.  And do you have any knowledge if
 5 she's with the Dole VA?
 6    A.   Rumor has it she's not, but I don't know
 7 that directly.
 8    Q.   Okay.  Do you know if she's still in the
 9 state of Kansas or --
10    A.   I know nothing about that.
11    Q.   Okay.  So we've covered the contractual
12 issues.  What about cost per unit; what do you
13 recall covering on that aspect of your review?
14    A.   I don't have any specifics at my
15 fingertips, but I do know that the analysis was
16 that we were significant outliers.
17         But there were two issues.  There
18 were cost per unit, and there was the number of
19 units consumed.  And between the two, the total
20 cost was -- because when you look at cost per unit,
21 you could look at cost per device, or you could
22 look at cost per patient.
23         And our cost per patient was way, way
24 higher than it should have been.  I hate to refer

Page 40

 1 to a patient as a unit, but that was our
 2 measurement.
 3    Q.   I see.  That's helpful.  Thanks for
 4 clarifying that.
 5         So, again, what were you -- what were
 6 you comparing Dole VA with to say that the cost per
 7 patient was way, way higher than -- and an outlier?
 8       MS. HUYSER:  Objection to form.
 9       THE WITNESS:  Again, our team -- our team
10 would pull costs compared to other VA hospitals,
11 and it was not -- it was not exclusive to our size.
12 It was just across the board.  Because at this
13 point we said, okay, I need to know how I compare
14 to other facilities, period.
15         And the one number that I recall -- I
16 don't recall the number, but one relationship that
17 I recall is that we were more expensive than, I
18 believe it was, the top ten hospitals in the VA
19 combined.  And that would have included hospitals
20 like Atlanta, Palo Alto, Phoenix, Hines VA here in
21 Chicago.
22         So that was a metric that jumped off
23 the page at me.  I couldn't tell you the numbers,
24 just the relationships.

Page 41

 1 BY MS. BROUS:
 2    Q.   At this point in the process, is your
 3 mind thinking there's something fraudulent going
 4 on?
 5       MR. BARTH:  Object to form.
 6       MS. HUYSER:  Objection to form.
 7       THE WITNESS:  My feeling was that we either
 8 had very, very bad providers or we had product
 9 walking out the door, and I didn't know which.
10 BY MS. BROUS:
11    Q.   Would both of those things an outlier,
12 as you just described, with the most expensive top
13 ten VAs in the hospital -- in the nation, the cost
14 per unit or per patient, as well as the number of
15 units consumed?
16       MS. HUYSER:  Objection to form.
17       THE WITNESS:  To answer that question, I'd
18 have to have the numbers in front of me and do the
19 actual math.  So I'll look at the top line, not
20 those two individual lines.
21         The top line is what had us to be the
22 significant outlier.  And it would have been a
23 combination of the number as well as the cost per
24 unit, but I can't tell you -- I know the number was

Page 42

significantly high. Mathematically, I don't know if the cost per unit was high, cost per device. Cost per patient was high.
BY MS. BROUS:
Q. So did you do anything to look into your thoughts of either we have very bad providers or we have product walking out the door? Did you look into those issues?
A. We did. So as I'm thinking of the accountability matrix, these things, you know, in my mind, need to be occurring on a concurrent basis. Because, from my prior life pre-health-care, I don't want to draw conclusions. I want to put together an assessment that gets me the answer.
    So while we were looking at the number of units, the cost per units, the protocol, the inventory management of units, I also wanted somebody to assess the, I'll say, clinical efficacy of the units. And it would have been difficult to do that internally. So we chose to go externally.
Q. So what -- what -- did you hire some physicians, or what did you do externally?
MS. HUYSER: Objection to form.

Page 43

THE WITNESS: So, again, the mechanism, we went to another VA hospital in Oklahoma City. And we talked to, within the VA system, a very highly respected interventional radiology physician. And we also went -- I don't believe it was at the same facility, but another facility, but it was perhaps the same facility -- an administrative officer for a radiology department.
    And we wanted both of their assessments; one on controls, management, protocols, ordering procedures, inventory management from the administrative side, to see how we compared in those areas. And from the clinical side, we wanted the provider to do a deep dive on the actual records to see if, clinically, we were at least within the parameters.
BY MS. BROUS:
Q. Do you recall the name of the highly respected IR physician in Oklahoma City?
A. I do not.
Q. Do you know the names Dr. Hassan or Dr. Bui, B-u-i?
A. I do.
Q. Okay. Who are they?

Page 44

A. So Dr. Hassan was the -- boy, oh, boy. I could be inaccurate in this. But to my recollection, Dr. Hassan was the associate chief of staff for medicine, which meant the nonsurgical, non-behavioral-health medical providers were under his leadership.
Q. At Dole VA?
A. At Dole VA. I'm sorry. Yes.
Q. Okay. Okay. And then what about Dr. Bui?
A. I believe Dr. Bui was an orthopedist.
Q. At Dole VA?
A. Yes.
Q. Okay. And Dr. Raffi. Do you know that name?
A. I do. Dr. Raffi, at various times, was stepping in as the interim chief of staff. So he had a number of roles at the associate chief of staff level. But during my tenure, he was elevated to the interim chief of staff at various times. So he would have been immediately reporting to me probably for half of my tenure, and then reporting to the chief of staff for the rest of my tenure.
Q. At Dole VA?

Page 45

A. At Dole VA. I'm sorry. Yes.
Q. Thank you. If you recall later today the name of the IR physician in Oklahoma City, will you let me know, just interrupt me or --
A. Sure.
Q. -- tell Ms. Hunter, maybe, if you think of it after.
A. Okay.
Q. Thank you. And we'll look at some documents, too. I know the name might be in there.
A. Okay.
Q. Okay. So tell me -- and thank you for going through this so detailed. This is really helpful.
    Can you tell me and the jury -- we might play your deposition for the jury at trial.
    So can you kind of explain to the jury what you did or the IR physician did at Oklahoma City, what -- you know, to your knowledge, tell me about the clinical deep dive you did of patient records.
MS. HUYSER: Objection to form.
THE WITNESS: Again, this --
MS. HUNTER: And I'm going to object to the

Page 46

1 point that it solicits 5705 -- 38 U.S.C. 5705,
2 protected information.
3         So if it comes from a quality
4 assurance review, don't answer that question.  But
5 anything else out of the quality assurance review,
6 you can answer.  Or peer review would be another
7 example of something you can't answer.
8     MS. BROUS:  Can we go off the record for a
9 minute?  Just --
10     MS. HUNTER:  Can we talk really quick?
11     MS. BROUS:  Sure.
12     THE VIDEOGRAPHER:  Going off the record at
13 10:49 a.m.
14         (Discussion had off the record.)
15     THE VIDEOGRAPHER:  This begins media unit 2.
16 Back on the record at 10:51 a.m.
17 BY MS. BROUS:
18     Q.  Okay.  Before we get into the clinical
19 deep dive of the records, I want to ask you, do you
20 remember the specific VA in Oklahoma City that this
21 IR physician was from?  Are there a couple of VAs
22 in Oklahoma City?
23     A.  There's a couple of VAs in Oklahoma, but
24 I believe he was from the Oklahoma City VA.

Page 47

1     Q.  Okay.  Thank you.  So what did you do to
2 do a clinical deep dive into patient records at
3 Dole VA?
4     A.  So, again, I'm not a subject matter
5 expert, and I'm not clinical.
6         But the approach, to my
7 understanding, was there was a list of patients
8 polled.  I don't know if it was a comprehensive
9 list for a particular period of time.  My
10 recollection is that it was a targeted -- meaning a
11 window of time of patients that had interventional
12 radiology.  And my understanding is it was a
13 100 percent review of the charts of everybody that
14 was in that cohort.
15         Those charts were sent to the
16 reviewer.  We identified some questions, and I
17 couldn't tell you what they were.  But they were
18 questions that were basically addressing efficacy.
19 And asked him to, you know, just give us
20 perspective.
21     Q.  Do you recall approximately how long the
22 doctor's review of the records took?
23     A.  My recollection is it was, I want to
24 say, within 90 days.

Page 48

1     Q.  And are we in 2018 now, to your memory,
2 or still in 2017 or -- if you can say?
3     A.  It clearly was not 2017.  I believe it
4 was 2018 at this point.
5     Q.  And at this point in 2018, had you had
6 any communication from the US Attorney's Office or
7 the Department of Justice?
8     A.  No.
9     Q.  Did you have any knowledge in 2018 that
10 there was either a criminal or a civil
11 investigation of kickbacks and medical necessity
12 issues and excessive devices at Dole VA?
13     MS. HUYSER:  Objection to form; misstates the
14 record.
15     THE WITNESS:  I need to answer that question
16 more broadly, or can you ask it more specifically?
17 Because I need to be careful, yeah.
18 BY MS. BROUS:
19     Q.  Sure.  At any point in time did you
20 become aware of a Department of Justice
21 investigation, either civil or criminal, into the
22 IR procedures at Dole VA?
23     A.  I -- go ahead.
24     MS. HUNTER:  Objection if it solicits

Page 49

1 attorney-client privilege information such that the
2 United States is a defendant of the VA.
3     MS. BROUS:  Is an attorney of the VA, you
4 mean?
5     MS. HUNTER:  Attorney.  Did I say defendant?
6     MS. BROUS:  Yes.
7     MS. HUNTER:  I apologize.  Attorney.
8         Jon, I don't -- Jon may need to
9 answer that question.  I don't -- I'm objecting for
10 you, Jon, but I don't know the answer to that
11 question.
12     MR. FLEENOR:  Yeah.  I think it's safe to say
13 let him answer what he may know, and then we can
14 elicit -- find out who it was from and make the
15 objection then.
16     MS. HUNTER:  Okay.  Go ahead.
17     THE WITNESS:  I was not aware that the
18 US Attorney's Office was involved.
19 BY MS. BROUS:
20     Q.  Did you ever at some point become aware
21 that the US Attorney's Office was involved?
22     A.  No.
23     Q.  Were you aware of any investigations
24 happening outside of the one you were conducting?

Page 50

A. Yes.
Q. And what was that?
A. I made a referral myself to the VA Office of Inspector General, Criminal Division, for them to look into this matter. And we provided the documentation that we had collected at that point.
Q. Do you recall approximately when that was?
A. I couldn't tell you even the year, let alone the month. But I could tell you it was during the course of the investigation because they were aware that I had external clinical counsel looking at charts.
    And they -- because you get -- within the VA, I was learning, there were certain reporting requirements that I had. So -- and I needed to follow the advice so I didn't break any VA rules. And they were in agreement for us to continue down the course that we were heading, which was a business efficiency study.
    And the second we identify anything that was, we felt, broader than business efficiency, we would let them know, but then we would also let them handle it. So, yes, we brought

Page 51

them into it, but I don't know what they found or who else they were involved with.
Q. What -- the report requirements, what reporting requirement was triggered to have you reach out to them?
A. I wouldn't know specifically.
Q. Okay.
A. It was probably just the fact that I was new, and I wanted to make sure that I --
Q. Okay.
A. -- didn't go off reservation.
Q. Sure. Do you have any knowledge of what, if anything, the VA OIG criminal investigation did with the information?
A. I do not.
Q. Did you ever hear back from the VA OIG criminal investigation?
A. So I had dialogue with the -- I would say the lead investigator, seeking input and feedback on the status. Because we're conducting, at this point, a management assessment, and I didn't exactly know what I was dealing with. So I was needing feedback from them so I knew where and how to proceed from a management side.

Page 52

Q. Was that investigator Nathen Howard?
A. That name sounds very familiar. I believe it was Nate.
Q. Was Special Agent Howard giving you any direction of what to do next?
A. No. It was kind of a one-way street. We were providing our investigative work.
Q. And what do you recall providing Special Agent Howard?
A. Again, I apologize for the vagueness, but I want to say "everything." I want to say we provided the plan, our approach. We provided the medical reviews and assessments. We provided everything from lists of employees in the departments to -- we provided everything.
Q. Did you -- how did you do this, sort of, technology-wise? Was it e-mails or Dropbox, the government Dropbox equivalent, or do you recall, was it printed?
A. I would not have gotten involved in that kind of detail.
Q. Okay.
A. Nate and I would have talked, we would have talked with the team, and the folks that were

Page 53

doing the work on my behalf would have coordinated. They would have done that.
Q. Okay. So what did you learn from the clinical deep dive that the respected IR physician did in Oklahoma?
MS. HUYSER: Objection.
MR. BARTH: Join.
THE WITNESS: Again, this is purely off of recollection. So it's going to be very vague.
    But a significant number of the patients that were assessed had exorbitant -- the number of devices that were used in their care was exorbitant compared to the medical standards that were expected, is my interpretation of what I heard from the clinicians, since I'm not clinical.
    I recall a certain number of them were five times the expected amount, and I want to say there were -- for some reason, and I could be wrong, there were some that stuck out that were double digit in terms of the number of devices that were used per patient.
BY MS. BROUS:
Q. And this is an IR physician who does the same type of work that the WRG IR physicians were

Page 54

1  doing in the cath lab at the Dole VA; is that
2  correct?
3      MR. BARTH: Objection to form; foundation.
4      MS. HUYSER: Join.
5      THE WITNESS: My understanding is that this
6  was not just a physician in the department at
7  Kansas City. It was, I believe, the chief of
8  interventional radiology, and I believe on faculty
9  at the university.
10 BY MS. BROUS:
11     Q. You said Kansas City. Did you mean
12 Oklahoma City?
13     A. I'm sorry. I apologize. Oklahoma City.
14     Q. Okay. So the chief of IR at the VA and
15 then also on staff at the University of Oklahoma?
16     A. I believe so.
17     Q. Do you recall if the clinician also had
18 a private practice outside the VA?
19     A. I wouldn't know that.
20     Q. Okay. Do you recall the devices that
21 were part of these findings that the physician is
22 reporting back to you?
23     A. Wow. Now you're really testing my
24 memory. I'll know it if I hear it.

Page 55

1      Q. Okay.
2      A. Yeah.
3      Q. Drug-coated balloons?
4      A. I know that there were balloons. I just
5  don't know what type. And I believe the term
6  "TurboHawk," perhaps, but I could be way off.
7      Q. TurboHawk is an atherectomy device. And
8  what about stents?
9      A. My understanding was yes, but, again,
10 I'm not clinical.
11     Q. Sure. And I just want to know your
12 memory from this doctor and what he conveyed to
13 you. Was this in a -- telephone conversations or a
14 written report or both? In-face meetings?
15     A. We received written reports, but we also
16 received verbal briefings. I want to say
17 face-to-face because I recall the gentleman's
18 looks, and I had never met him before. So it would
19 have had to have been face-to-face. But clearly we
20 also got written reports to back it up because we
21 forwarded those on.
22     Q. Okay. You forwarded them on to Special
23 Agent Howard?
24     A. Correct.

Page 56

1      Q. Okay. How many reports do you recall
2  receiving from this physician?
3      A. I couldn't tell you. My recollection is
4  it was a summary report, a big report. But I
5  couldn't tell you if that was done in parts. I
6  just don't recall.
7      Q. The verbal briefings face-to-face, how
8  many meetings do you recall having with the
9  physician face-to-face?
10     A. Again, I couldn't tell you. It's -- to
11 me, I remember the discussions, but whether it was
12 one or multiple, I just don't know. Yeah.
13     Q. Do you recall if they were in Oklahoma
14 City or in Wichita?
15     A. It was all in Wichita.
16     Q. Okay. What was your reaction to what he
17 was reporting back to you?
18     A. I had mixed emotions. I'm not a
19 clinical person, and I want to say the term
20 "egregious" was used. I'm a business guy, and I
21 look at processes and I look at cost relationships
22 and I look at efficacy.
23         And the mixed emotions were that we
24 had somebody validating my original assumption.

Page 57

1  But I was also extremely disappointed that that had
2  occurred. So it was kind of like validation, but I
3  really wish I was wrong.
4      Q. Did it make you concerned for patient
5  care?
6      A. It did.
7      MR. BARTH: Object to form.
8      MS. HUYSER: Join.
9  BY MS. BROUS:
10     Q. And we talked about the two things that
11 ran through your mind when you saw the outlier
12 numbers compared to nationwide VA hospitals, and
13 you thought it was either very bad providers and/or
14 you have products walking out the door.
15         So when you said it confirmed your
16 assumption, were you talking about the very bad
17 providers?
18     THE WITNESS: Correct.
19     MS. HUYSER: Objection to form.
20     MR. BARTH: Join.
21     THE WITNESS: Again, my impression as a
22 nonclinical person from the report that I received
23 from the clinical person.
24

Page 58

BY MS. BROUS:
Q. And is this why you shut down the cath lab at the Dole VA?
MS. HUYSER: Objection to form.
MR. BARTH: Join.
THE WITNESS: I shut down the cath lab because we were concerned in that we didn't know what the issues were. But I'll be honest, I do not remember if we shut down the cath lab before we got the report back or after we got the report back.
    I do know that we had enough concern to shut the lab down until we knew better, but I don't know which came first.
BY MS. BROUS:
Q. Was this cath lab a major -- one of the major areas of care that the Dole VA provided?
MS. HUYSER: Objection to form.
THE WITNESS: Can you clarify your question --
MS. BROUS: Yeah.
THE WITNESS: -- in terms of "major."
BY MS. BROUS:
Q. Yeah. And I'm trying to determine, was this a big deal when the cath lab got shut down, and did it affect a -- you know, a bigger line of

Page 59

care that the hospital offered to veterans?
MS. HUYSER: Objection to form.
THE WITNESS: There's multiple pieces to that answer. So if you'll give me some latitude.
BY MS. BROUS:
Q. Sure. Please.
A. In terms of scope, our behavioral health program represented a third of our veterans. So that was probably the biggest impact in terms of number of veterans.
    But in terms of acuity and potential clinical implications, if we're not doing it properly, this would be right up there with surgery in the emergency room. If we aren't providing good clinical quality and good clinical outcomes, the impact would be greater.
    So it's difficult for me to quantify which was a bigger deal, but this is one, to me, that clinically we needed to address.
    And if I could also clarify. I don't believe we shut down the cath lab. I believe we shut down interventional radiology and kept the cath lab open, but I'm not completely sure.
Q. Thank you for that clarification.

Page 60

Do you have any knowledge of, a little bit later in time, the cardiac lab shutting down?
A. I don't recall.
Q. Do you have any of knowledge of what, if anything, was done with the contract between Dole VA and WRG at the time that the IR procedures were shut down?
MR. BARTH: Object to form.
THE WITNESS: I don't have any information or knowledge of the outcome. I do know that we looked at what our latitude and leverage was, but also understood that that was -- would have to be addressed through the contracting side of the organization, which we were not responsible for.
BY MS. BROUS:
Q. Who would have been responsible?
A. The -- I'm not sure what the term is in Kansas City anymore. It was a contracting arm of the VHA.
Q. And do you recall a name of anyone who that would have been at the time for Dole VA?
A. I do not.
Q. Have you told me -- you know, have I

Page 61

asked you the questions that would have you tell me everything you know personally about this issue that was in your mind about we have very bad providers? Is there anything else that I haven't asked you that you'd like to add to that?
MS. HUYSER: Object to form.
MR. BARTH: Join.
THE WITNESS: I don't believe so. As a nonclinical person, I wanted an outsider's perspective on the quality of the care and the procedures. And I feel like we received a report that addressed that, and that's all I know.
BY MS. BROUS:
Q. And I think you said this IR physician from Oklahoma City was highly respected. What makes you say that?
A. I don't remember all the steps that we took, but the -- we talked to other radiology professionals. We communicated between our VISN and their VISN to get, you know, an idea of some potential names.
    Dr. Foley, my associate medical center director, had come from Oklahoma City, and she threw his name in the hat as a credible source.

Page 62

1 So I never met the individual, but from multiple
2 sources, it was determined that he really would be
3 a quality provider and an external set of eyes.
4      Q.   And you recall him discussing with you
5 balloons and an atherectomy device called
6 TurboHawk; is that right?
7      A.   Yes.  But as a nonclinical person, I
8 couldn't tell you the difference between a balloon,
9 a TurboHawk, and a stent.  They could be
10 interchangeable terms as far as I'm concerned, but
11 all three were discussed.
12      Q.   Gotcha.  Do you recall the doctor
13 telling you the standard of care, the normal amount
14 of devices that should be used being like one or
15 two?
16      MR. BARTH:  Object to form; foundation.
17      MS. HUYSER:  Join.
18      THE WITNESS:  I do recall.  I don't recall the
19 exact number.  I recall a number that's in my mind,
20 implanted in my mind.  But whether this is
21 accurate, I'll have to -- but the reason I know it
22 is because I specifically asked.
23           As a nonclinical person, if somebody
24 tells me that we have a number of patients that

Page 63

1 have, you know, five of these devices, and we have
2 other patients that have in the double-digit number
3 devices, my natural response was "So what's the
4 standard of care?"  And as I recall, the standard
5 of care was one to two.  That's my recollection of
6 his comment.
7 BY MS. BROUS:
8      Q.   And do you recall him saying one to two
9 for the balloons or the atherectomy or the stents
10 or all of them?
11      MR. BARTH:  Object to form and foundation.
12      THE WITNESS:  That's much more specific than I
13 would know.
14      MS. BROUS:  Okay.
15      THE WITNESS:  It just is stuck in my mind one
16 to two versus eleven.  There's a difference here.
17 BY MS. BROUS:
18      Q.   Okay.  So as you're reviewing the report
19 that shows the number of devices used on these
20 patients at the Dole VA, in your head you're
21 thinking one to two is the standard of care, and
22 you're seeing sometimes double-digit amounts of
23 devices; is that fair?
24      A.   That is correct.

Page 64

1      MS. HUYSER:  Object to form.
2 BY MS. BROUS:
3      Q.   So I want to ask you about the other
4 thought you had about we have products walking out
5 the door.  Did you learn anything in your time as
6 director about that issue?
7      A.   I did.
8      Q.   What did you learn?
9      A.   So Ryan -- and his last name is escaping
10 me again.  He's our facilities logistics manager.
11 Kittrell.  Ryan was new in his role, and supply
12 chain, to me, is a big deal.  It's a way that you
13 can really reduce costs and get meaningful impact
14 quickly without impacting benefits or number of
15 employees.  It's a -- I call it low-hanging fruit.
16           Ryan was very attentive at trying to
17 learn as much as he could about supply chain.  So
18 when we heard about the volumes, I don't remember
19 the exact step that he went through, but he
20 identified that some mechanism that we had, some
21 supply chain report that he received, those reports
22 didn't match the volume that we were seeing.
23           So he went down and did a number of
24 actual walk-throughs and just kind of followed the

Page 65

1 process step-by-step.  How were these devices
2 logged in?  How were they inventoried?  How were
3 they tracked when they're signed out to the
4 department?  How does all of that work?
5           And, again, I won't be exact here,
6 but one of the things that was identified was that
7 they were not being delivered to the facility under
8 the normal inventory control protocols.  In other
9 words, we didn't sign for these, put them in
10 inventory, sign them out from inventory to the
11 department.  They were showing up directly on the
12 loading dock, and in some instances being stored in
13 one of the manager's office, never hitting the
14 inventory system.  This was an epiphany.
15      Q.   Okay.  I want to ask you about a few
16 things you said.  When you said "the devices," are
17 you talking about -- which devices?
18      A.   The devices -- the devices in question
19 regarding our interventional radiology costs.
20      Q.   And were those all Medtronic devices?
21      MS. HUYSER:  Objection; form, foundation.
22      THE WITNESS:  I'll be honest, I couldn't tell
23 you that.  It was the balloons, the stents, and the
24 TurboHawks.  But I wasn't as concerned about the

Page 66

 1  purveyor as the process at that point.
 2  BY MS. BROUS:
 3      Q.  Okay. So when you say -- thank you for
 4  clarifying. When you say devices, you meant these
 5  three categories: Balloons, stents, and the
 6  TurboHawks, correct?
 7      A.  Correct.
 8      Q.  And so there was concern because the
 9  inventory was not being signed in when it came to
10  the VA hospital, and then signed out to the
11  department that was using the device? Do I have
12  that right?
13      THE WITNESS: Correct.
14      MS. HUYSER: Objection to form.
15  BY MS. BROUS:
16      Q.  And you talked about the devices coming
17  directly on the loading dock. Can you tell me a
18  little bit more about that.
19      A.  So normally, as you're trying to
20  determine the source of your costs variances, you
21  would follow the process; you would say did we
22  follow each step of the process. And you'd look at
23  multiple processes.
24      Our costs were high. So the

Page 67

 1  financial system had exorbitant costs. Our
 2  logistics inventory didn't match our supply costs.
 3  And we were in our infancy of supply chain
 4  management at Dole at the time. So there wasn't a
 5  reconciliation between finance and logistics.
 6      There was after that, but up until
 7  that point it was perplexing me. Because from the
 8  private sector I would say you should be able to go
 9  down the logistics side or finance side and
10  identify this issue. We weren't able to identify
11  it going down the logistics side, only down the
12  finance side. And if you didn't know to ask the
13  questions, it didn't stand out as an outlier.
14      So then the question was, well, if
15  it's not showing up in the logistics side, then how
16  do we get it. And that's when various folks -- and
17  I don't know who, but Ryan Kittrell led the
18  initiative to say how did they get in the building?
19  How did they get to the patient? And that's when
20  they did kind of a -- they kind of just did a
21  walk-through.
22      The inventory would show up in our
23  loading dock area. I couldn't tell you exactly
24  where. And the inventory would end up in our --

Page 68

 1  some of the inventory would end up in the manager's
 2  office. Some of the inventory would go straight to
 3  the cath lab. And I should be able to go at any
 4  one time and say what's our inventory hanging on
 5  the walls in the cath lab? What does that match
 6  with in our logistics?
 7      We couldn't do that. So that's when
 8  we knew we had a problem.
 9      Q.  To your knowledge, was there ever any
10  determination of who was taking the inventory
11  showing up on the loading docks of these devices to
12  the cath lab?
13      And I'm going to tell you a name that
14  that's -- that the cath lab manager at the time was
15  Teri Brinkley. So I'm not sure if you know that
16  name or if that will help you.
17      A.  I know that name. But I'll be honest,
18  the path from the loading dock to Teri's office is
19  cloudy to me. I don't know that we ever did
20  resolve that. But Teri's office was the office
21  that inventory was sitting in that was not on our
22  inventory logs.
23      So, yes, it was getting to Teri's
24  office, but whether Teri was moving it from the

Page 69

 1  loading dock, I couldn't tell you. It was just
 2  that it was inappropriate to be in her office.
 3      Q.  In your years with the VA, do you have
 4  any knowledge of anyone at the VA storing inventory
 5  in their office like Ms. Brinkley was?
 6      MS. HUYSER: Objection; form and foundation.
 7      THE WITNESS: I don't have any knowledge of
 8  that, but I also can't say that it doesn't exist
 9  because I just -- I have not been around long
10  enough.
11  BY MS. BROUS:
12      Q.  Okay. But it was inappropriate,
13  correct?
14      A.  Right. If it did exist, it would be
15  inappropriate, regardless of where it was. Yeah.
16      Q.  Did you personally go to Teri's office
17  to see inventory?
18      A.  I did, actually. Ryan walked me through
19  and gave me kind of a bird's-eye view of kind of
20  the process that he had uncovered, and actually
21  walked me into her office and walked me into the
22  cath lab, a number of us, and kind of showed us --
23  we call it the supply chain walk. We just did the
24  walk and say, okay, what's happening here? What

Page 70

should happen here? And -- yeah.
Q. Was Teri present for that?
A. I believe not. She was not present when I went through the walk.
Q. So what do you recall seeing when you went through the walk?
A. When I went through the walk in her office, I personally didn't see any devices in her office. But Ryan and other folks that were part of this assessment had seen it. So, in other words, the inventory was moving, and the particular time that I went to the office, there was no inventory at that time; although other employees, like Ryan, had witnessed the inventory.

But when we went into the cath lab itself, he actually showed me the way that various devices were hanging on the walls and how we were managing it. And he -- you know, he would pull a device, and he'd say, okay, this should be in inventory somewhere, and it wasn't.

So he was able to show us visually the amount of inventory that was in the cath lab that was not in the inventory on the books at the hospital.

Page 71

Q. How would you describe the quantity that you saw?
MS. HUYSER: Objection to form.
THE WITNESS: It's hard for me to say because I just don't know what a comparative would look like. I was really more concerned about the process, and it was not a good process. So that's what alerted me, is that the process was problematic. Let's fix the process, was our thinking.
BY MS. BROUS:
Q. And when you say devices should have been in inventory, physically where should they have been?
A. Physically, I don't mind them being in the cath lab. But when I say inventory, I mean in the system. They should have been tracked through supply chain. I should have been able to pull a report from supply chain and say how much inventory do I have. And the inventory should say we've got this many devices sitting in storage unit X, we've got this many devices sitting in the cath lab ready for utilization, and we should be able to track that back to our costs and say, okay, everything's

Page 72

here.
Q. Was it Ms. Brinkley's -- one of her duties as cath lab manager to enter the inventory into the system?
A. I couldn't tell you that.
Q. But as far as you know, though, you were finding the inventory was not in the system and not matching the financial records that you were seeing that showed what the VA was actually paying for, correct?
MS. HUYSER: Objection; form.
THE WITNESS: That is correct.
BY MS. BROUS:
Q. Do you recall how much of a gap there was between the two? Or let me ask you this way. The gap that you saw, did it concern you?
A. It was alarming. It was alarming. But, again, I'm a process guy. So my recollection is it was alarming because we had no way to -- we should have known, and had no way to know that that much inventory was sitting on the shelves that was not in the books. So that's what I -- that's what I -- the process was such that we didn't catch it.
Q. So did you then make any conclusions in

Page 73

your mind based on what you knew about where all this excess inventory was going?
MS. HUYSER: Objection; form.
THE WITNESS: Conclusions in my mind?
BY MS. BROUS:
Q. Yes.
THE WITNESS: Am I allowed to say that?
MS. HUNTER: Yes.
THE WITNESS: At one point in the -- at some point in the process, I'm not exactly sure when, but I was knowledgeable before I left of the instincts that I'm about to tell you.

That even though our usage per patient was excessive, dramatically excessive, compared to the VA -- other facilities in the VA, the -- because our supply chain wasn't able to capture it, our costs also didn't match that utilization. So I had, very distinctly, in my heart of hearts, a feeling that we were excessive in our utilization per patient and that inventory was walking. Because even those two didn't match.

And that's not coming from my experience as a VA employee. That's coming from my four years as a federal agent. I just had

Page 98

1 the rules so that this ceases immediately.
2      But the fourth impression, a fourth
3 impression -- there may have been more -- was that
4 this really was not the focus of the Dole
5 investigation. And what I mean by that is, even if
6 all of this were true and it's improper and we need
7 to address that administratively, these are from
8 alleged receipts from a representative. And, to
9 me, that really had no bearing on what we were
10 looking at, which was propriety and volume and
11 supply chain of the devices. To me, that was kind
12 of different.
13      Interesting enough that I need to
14 brief my staff, but it really had nothing to do
15 with the -- what we were looking at, which is why I
16 didn't get too involved with this. I was real
17 careful to separate administrative protocol and
18 procedure and financial management from the
19 investigative role provided by the OIG.
20 BY MS. BROUS:
21   Q.   Thank you for that. Did you have an
22 impression when you reviewed all of these expenses
23 and dates and amounts that this was an offer by
24 Medtronic given to Dole VA employees to induce them

Page 99

1 to make purchases of devices?
2      MS. HUYSER: Object to form; foundation; calls
3 for legal testimony.
4      THE WITNESS: I tried to be very objective and
5 focused in my role, and my role was to clean up our
6 administrative irregularities and assess whether
7 there was clinical impropriety being done. It's
8 easy to say these were inducements. I don't want
9 to go that far. What I want to say is that it was
10 inappropriate for my staff to partake. So we
11 briefed my staff accordingly. The motive, I can't
12 address.
13 BY MS. BROUS:
14   Q.   Okay. And I understand, you didn't
15 address any kickbacks or bribes in your
16 investigation that you were in charge of, correct?
17   A.   That is correct.
18   Q.   Okay. And you were relying on OIG to do
19 that, correct?
20   A.   Correct.
21      MS. BROUS: Okay. I could -- we're going to
22 Keene Exhibit 8. And this reminds me of a question
23 I forgot to ask you earlier. This is WRG 992. If
24 we could mark this as the next exhibit in your --

Page 100

1 in the Ament deposition, which I think is 5.
2      (Ament Deposition Exhibit 5 was
3       marked for identification.)
4 BY MS. BROUS:
5   Q.   You told me earlier it was inappropriate
6 and concerning that Dole VA employees were being
7 provided meals by the Medtronic rep. Do you
8 remember that?
9   A.   I do remember that.
10      MS. HUYSER: Objection; form.
11 BY MS. BROUS:
12   Q.   Okay. Was it also inappropriate and
13 concerning to you that physicians who were not Dole
14 VA employees but who were doing contract work for
15 Dole VA were receiving food and meals from a
16 Medtronic representative?
17      MR. BARTH: Object to form; foundation.
18      MS. HUYSER: Join.
19      THE WITNESS: If a member's credentialed to be
20 on our medical staff and they're performing care in
21 our facility, they're required to follow the same
22 rules as anybody else, whether they're contracted
23 or employed. So yes.
24

Page 101

1 BY MS. BROUS:
2   Q.   So if we look at Exhibit 5 I just handed
3 you, you're not on this, but it's an e-mail -- if
4 you go down to the bottom -- from Kermit Rust to
5 Teri Brinkley, subject "Hey." Do you see that?
6   A.   Mm-hmm.
7   Q.   Okay. Do you have an understanding who
8 Kermit Rust is?
9   A.   I do not.
10   Q.   Okay. I'll represent to you that at the
11 time he was an IR physician with WRG. Okay?
12   A.   Okay.
13   Q.   And he sends an e-mail to Teri Brinkley,
14 and we talked about she was the cath lab manager,
15 correct?
16   A.   Correct.
17   Q.   And you learned from Ryan that at some
18 point she had inventory that was being stored in
19 her office, correct?
20      MS. HUYSER: Object to form.
21      THE WITNESS: That is correct.
22 BY MS. BROUS:
23   Q.   Okay. And the inventory was not in the
24 Dole VA inventory system, correct?

Page 102

1  MS. HUYSER: Object to form.
2  THE WITNESS: That is also correct.
3  BY MS. BROUS:
4  Q. Okay. Did Ryan say how much inventory
5  or give you an idea of how much inventory was in
6  Ms. Brinkley's office?
7  A. No, because it was -- you know, as you
8  can imagine, it was an ongoing issue. So in terms
9  of at any one time at a static period of time, I
10 don't know the answer to that. Yeah.
11 Q. Okay. Do you recall any conversations
12 with Ryan where he's like, you know, it's not just
13 one or two devices, it's like 30?
14 A. Yeah.
15 MS. HUYSER: Object to form.
16 THE WITNESS: It was a significant number. I
17 just don't know what the number was.
18 BY MS. BROUS:
19 Q. And that's what Ryan told you?
20 A. Correct.
21 Q. Okay. Thank you. So this was from
22 Dr. Rust to Teri Brinkley. "Hi, Teri. Hope
23 everyone is doing well." And then he says "Week of
24 August 18th sounds good to me." And this is dated

Page 103

1  June 23rd, 2016. Do you see that?
2  A. I do.
3  Q. Okay. He says "I found out Doug and I
4  are actually going to be neighbors. So now we have
5  to use Medtronic. LOL." Do you see that?
6  A. I do.
7  Q. Okay. And I'll represent that that's a
8  reference to Doug Winger, the Medtronic sales rep.
9      Do you think it's inappropriate that
10 Dr. Rust is saying we have to use Medtronic because
11 Doug and I are actually going to be neighbors?
12 MR. BARTH: Object to form; foundation.
13 MS. HUYSER: Join.
14 THE WITNESS: Can you read that back, please.
15 I want to make sure I answer the correct question.
16     (Record read as requested.)
17 MR. BARTH: Same objection.
18 THE WITNESS: I think it's inappropriate for
19 two reasons. First of all, because the statement
20 is made about the relationship with the vendor.
21 And, second, that it was made to one of my
22 employees. So it is, as far as I'm concerned,
23 problematic for two reasons.
24

Page 104

1  BY MS. BROUS:
2  Q. And would you agree that it gives the
3  appearance that this personal neighbor relationship
4  could have an influence on inducing purchases of
5  Medtronic devices at the Dole VA?
6  MR. BARTH: Object to form and foundation.
7  MS. HUYSER: Join.
8  THE WITNESS: Can you read that again, please.
9  I'm sorry.
10     (Record read as requested.)
11 THE WITNESS: I won't go that far because I'm
12 very careful to not assume. The dialogue is
13 inappropriate. What the motive for the dialogue, I
14 can't attest to.
15 BY MS. BROUS:
16 Q. Okay. But you can attest that there was
17 an excessive, exorbitant amount of Medtronic
18 purchases of devices made during the 2016 time
19 frame that this e-mail was sent, correct?
20 MS. HUYSER: Object to form and foundation.
21 MR. BARTH: Join.
22 MS. HUNTER: Can you -- I'll object to form.
23 Can you clarify, the Dole VA?
24 MS. BROUS: Yes, at the Dole VA.

Page 105

1  MS. HUYSER: Same objection.
2  MS. HUNTER: You can answer the question.
3  THE WITNESS: So I can attest that the
4  inventory was excessive at the Dole VA from the
5  period of time that we were assessing. I don't
6  know that that included 2016, but it clearly was
7  after 2016, after this e-mail that our inventory
8  was excessive.
9  BY MS. BROUS:
10 Q. Okay. Thank you. And then do you see,
11 in the middle of the page, Ms. Brinkley responds on
12 June 23rd, 2016, the second paragraph: "I actually
13 meant we could go out to dinner with Doug the week
14 of July 18th." Do you see that?
15 A. I do.
16 Q. And would that be inappropriate for
17 Dr. Rust and Ms. Brinkley going out to dinner with
18 Doug Winger from Medtronic?
19 MR. BARTH: Object to form; foundation.
20 MS. HUYSER: Join.
21 THE WITNESS: It absolutely would be
22 inappropriate.
23 BY MS. BROUS:
24 Q. I think Ms. Keene testified, when I

Page 154

1  Q. Okay. Thank you for that clarification.
2  I just have one more -- one more
3  question about Exhibit 7, this e-mail. Do you see
4  where it says "Attachments, Consultant's review
5  recommendations" PDF that's Attachment No. 3?
6  A. In the title? Yes, yeah.
7  Q. Yes. Okay. And then if you look at
8  that Attachment 3, which was confirmed by the DVA
9  counsel that Attachment 3 is Brinkley Exhibit 30,
10 page 331 through 333, with a production date of
11 9/20/2022. Do you see that?
12 A. I do.
13 Q. Okay. Does that refresh your
14 recollection that the documents reflected in pages
15 331 through 333 are the consultant's review
16 recommendations?
17 A. No, it doesn't. May I explain why?
18 Q. Sure.
19 A. As I'm looking at the e-mail chain, I'm
20 not copied on this. I instructed my staff to
21 forward whatever documents they had to Nate Howard.
22 Okay?
23 Q. Okay.
24 A. These attachments were all sent to Nate,

Page 155

1  not even to me.
2  Q. Right. Okay.
3  A. Throughout the process, we had feedback
4  from the external consultant. This may very well
5  could have been one of those, but I don't know that
6  to be a fact because I'm not part of that e-mail
7  chain. So I don't know.
8  Q. Okay. Do you have a memory of the
9  consultant, Dr. Maqbool, telling you that there was
10 overaggressive treatment of lesions that needed to
11 be left alone?
12 MR. BARTH: Object to form, foundation.
13 MS. HUYSER: Join.
14 THE WITNESS: I do.
15 BY MS. BROUS:
16 Q. Okay. Do you have a recollection of
17 Dr. Maqbool telling you that evidence-based
18 medicine was not following in a majority of the
19 cases?
20 MS. HUYSER: Object to form.
21 MR. BARTH: Object to form and foundation.
22 THE WITNESS: I believe the comments to that
23 effect were made, but to say they were exact, I
24 can't attest to the exact nature of the contents.

Page 156

1  But generally, yes.
2  BY MS. BROUS:
3  Q. Okay. What do you recall him saying
4  about evidence-based medicine not followed?
5  A. I'm not clinical.
6  Q. Yeah.
7  A. So from four years ago, the recollection
8  I have is that, in my nonclinical language,
9  evidence-based practice was not followed, and we
10 were outside of the standard of care in many of the
11 cases that were reviewed.
12 Q. Okay.
13 A. Those are my words, yeah.
14 Q. Okay. In connection with that, you had
15 conversations with Dr. Maqbool about the number of
16 devices that were used, correct?
17 A. That is a correct statement.
18 Q. Okay. And you testified earlier that
19 one to two stuck out in your mind as being
20 appropriate, but you were seeing devices more than
21 one to two and even some in the teens, correct?
22 MR. BARTH: Objection to form, foundation.
23 MS. HUYSER: And mischaracterizes evidence.
24 THE WITNESS: Could you repeat that question,

Page 157

1  please.
2  (Record read as requested.)
3  THE WITNESS: Yeah, so what I recall is that
4  the standard should have been in the one-to-two
5  range and that there were examples of many at five
6  and a number in the teens.
7  BY MS. BROUS:
8  Q. Do you recall having conversations with
9  Dr. Maqbool about him not seeing pre- and
10 postprocedure notes on the patients?
11 A. That's more detail than I recall --
12 Q. Okay.
13 A. -- because it's been a while.
14 Q. Okay. And I think we covered, you
15 recall him talking about overutilization of DCB and
16 atherectomy devices, correct?
17 A. Correct.
18 Q. Okay. Do you recall him talking about
19 overaggressive treatment of lesions that need to be
20 left alone?
21 MS. HUYSER: Objection; asked and answered.
22 THE WITNESS: Again, because I'm not clinical,
23 that doesn't stick out.
24